IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHELLE WRIGHT** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 21-0561** |
| **v.** | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** | : | |
| **HEALTH SYSTEM d/b/a UNIVERSITY** | : | |
| **OF PENNSYVANIA HOSPITAL** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                    FEBRUARY 28, 2023

# MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Michelle Wright ("Plaintiff") filed an employment action against Defendant University of Pennsylvania Health System d/b/a University of Pennsylvania Hospital[1] ("Defendant" or "Penn"), in which she asserts claims of unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*, stemming from the unlawful termination of her employment.

Before this Court is Defendant's motion for summary judgment filed pursuant to Federal Rule of Civil Procedure ("Rule") 56, in which Defendant seeks the dismissal of Plaintiff's claims of discrimination and retaliation, arguing that Plaintiff has not established a *prima facie* case of discrimination or retaliation, and that Plaintiff's employment was lawfully terminated after she

---

[1]   Defendant notes that Plaintiff incorrectly identified Defendant as the "University of Pennsylvania Health System d/b/a University of Pennsylvania Hospital," instead of "The Trustees of The University of Pennsylvania, owner and operator of The University of Pennsylvania Health System." [*See* ECF 12, p. 1, n.1].

was observed sleeping on duty. [ECF 12]. Plaintiff opposes the motion. [ECF 16].[2] The issues presented in the motion for summary judgment have been fully briefed and are ripe for disposition. For the reasons set forth herein, Defendant's motion for summary judgment is granted, and judgment is entered in favor of Defendant on Plaintiff's claims.

**BACKGROUND**

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant—here, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The facts relevant to the underlying motion are summarized as follows:[3]

> Defendant is a medical facility in Philadelphia, Pennsylvania. Defendant hired Plaintiff, an African American woman, on February 1, 2016, as a Certified Nursing Assistant ("CNA"). Plaintiff was assigned to work primarily on the Rhoads 6 Unit,[4] an oncology unit at the Hospital of the University of Pennsylvania (the "Hospital"). In 2018, Nurse Manager Jenna Chrisanthon, a Caucasian woman, became Plaintiff's supervisor in the Rhoads 6 Unit. Plaintiff contends that she immediately noticed that Ms. Chrisanthon scheduled Caucasian CNAs to more overtime hours than to the African American CNAs.[5]
>
> As a CNA in the oncology unit, Plaintiff was responsible for, *inter alia*, assisting patients with their daily activities such as bathing, hygiene-care, getting dressed, and performing EKGs and vital signs. When assigned, Plaintiff was also responsible for performing "1:1" observations of vulnerable patients. A 1:1 observation is a patient safety measure that requires the CNA to maintain constant observation of a patient to prevent, such things as: accidental injury, disruption of

---

[2]   This court has also considered Defendant's reply. [ECF 17].

[3]   The facts are gleaned from the parties' respective briefs and statements of facts. To the extent facts are disputed, such disputes are noted, and if material, pursuant to Rule 56, will be construed in Plaintiff's favor.

[4]   Plaintiff also worked overtime hours in the Silverstein 10 Unit, a cardiac unit at the Hospital that is located in a different building than the Rhoads 6 Unit.

[5]   Defendant offers the ethnicity breakdown of the fourteen other CNAs in Rhoads Unit 6 in 2019 as follows: seven (7) identified as African American, four (4) identified as Indian, one (1) identified as Filipino, and two (2) identified as Caucasian. (Decl. of Jenna Chrisanthon, Def.'s Mot. Ex. H, ECF 12-3, ¶¶ 4–5).

2

treatment, falls, harm to others, and, in some cases, suicide. (*See* UPHS Staff Position Description and Performance Evaluation, Dep. Tr. of Michelle Wright Ex. 9, ECF 12-3).

Defendant maintains a Performance Improvement and Progressive Steps Policy (the "Progressive Steps Policy") that governs employee discipline. The Progressive Steps Policy outlines the following five-step progressive discipline system : (1) Coaching; (2) First Written Warning; (3) Second Written Warning; (4) Final Warning; and (5) Termination. Depending upon the nature of an employee's behavior and/or policy violation, some or all of the progressive steps may be bypassed. As set forth in the Progressive Steps Policy, examples of violations that would typically result in termination include "sleeping on the job" and "action or inaction that may create a life-threatening situation or that threatens the safety or well-being of a patient." Under the Progressive Steps Policy, a Progressive Step remains active for 365 days and is deactivated only when an employee completes a 365-day period without any additional policy violation. During her employment, Plaintiff was aware of the Progressive Steps Policy and understood that sleeping on the job was a terminable offense.

During her employment, Plaintiff received discipline for her attendance pursuant to Defendant's Progressive Steps Policy. Ms. Chrisanthon verbally coached Plaintiff for being inattentive to patients, failing to provide reports regarding her patients within the proscribed time frame, and doing homework while at work. On at least one occasion (discussed more fully below), Ms. Chrisanthon discussed with Plaintiff allegations that she had been sleeping on the job and had been doing homework during working hours. Plaintiff admitted to doing homework during her shifts "once the patients were done, and it was like a downtime."

On August 11, 2018, Plaintiff emailed Ms. Chrisanthon that she believed she was being "picked on" and "bullied" by Enrique "Ricky" Flores, a Registered Nurse on Rhoads Unit 6. Ms. Chrisanthon conducted an investigation. On August 27, 2018, Plaintiff, Michelle Biala, Ms. Chrisanthon, and Mr. Flores met in person to discuss Plaintiff's concerns. At the close of the meeting, both Plaintiff and Mr. Flores were instructed to report any further incidents.

On Saturday, September 15, 2018, at approximately 3:12 a.m. and 7:20 a.m., respectively, Plaintiff texted Ms. Chrisanthon that she had filed a grievance with Human Resources regarding "harassment." The purported harassment related to an incident between Plaintiff and Manjola Rubis, a Registered Nurse on the Rhoads 6 Unit. On this same day, Ms. Chrisanthon received an anonymously filed Safety Net Report involving Plaintiff and, separately, an email from Ryan McDevitt, a Registered Nurse on the Rhoads 6 Unit, regarding Plaintiff. The anonymous Safety Net Report noted that the reporter witnessed Plaintiff covered in blankets, with a space heater, sleeping.

3

Mr. McDevitt's email provided, in part, the following:

> On my Friday night 9/14, at one point during the shift Sharon was in the conference room laying on the chair with her shoes off. Whether this was her official break I don't know. At the same time Michelle was sleeping in her chair in POD 4 and when [M]anjola walked around to POD4, Michelle went into the break room to lay down. Manjola proceeded to follow her and take a picture of her. Minutes later the two proceeded to argue it out around 0300 in POD 3.
>
> Also, on this shift 9/14 Michelle was not only falling asleep in POD 4, she was also actively doing homework through out the night. I get on night shift you have down time, it is not right when these things affect your ability to answer call lights . . . There has been many times in which she does homework on night shift and has walked around with headphones in. I originally held off from getting into this because I did not want to get involved in Rickys and Michelles problems.

Plaintiff and Ms. Chrisanthon spoke on September 15, 2018, regarding Plaintiff's report against Rubis, the anonymous Safety Net Report, and Mr. McDevitt's email. Plaintiff apprised Ms. Corso by email of the circumstances that prompted Plaintiff's report to Ms. Chrisanthon. In Plaintiff's September 19, 2018 email to Ms. Corso, Plaintiff informed Ms. Corso that she was being "bull[ied]" and "harass[ed]" by "coworker[] RNs" because a picture was taken of Plaintiff with her head down during her break with the intent to get Plaintiff fired for sleeping and that Plaintiff believed her job was in jeopardy. Following receipt of Plaintiff's email, Ms. Corso met with Plaintiff to address Plaintiff's concerns. Plaintiff informed Ms. Corso that she would like to transfer to another unit, and Ms. Corso informed Plaintiff that she would notify Plaintiff if there was an opening.

Following the aforementioned incidents in August and September of 2018, Plaintiff made no further reports regarding any other employee. Plaintiff contends, however, that the harassment continued.

As to Plaintiff's request to work overtime, Plaintiff was scheduled to work an overnight shift on the Silverstein 10 Unit beginning on the evening of March 5, 2020 (the "March 5–6 Overnight Shift"). The Silverstein 10 Unit is a cardiac unit at the Hospital that is located in a different building than the Rhoads 6 Unit. During Plaintiff's March 5–6 Overnight Shift, Plaintiff was assigned a 1:1 observation of a vulnerable patient. According to Plaintiff, the patient was on suicide watch:

> Q. Do you know why the patient in that situation was on a one-to-one?

>    A.   He was being very combative.
>
>    Q.   Do you remember what exactly it was that he was doing that was combative?
>
>    A.   Well, if I'm not mistaken, they had him in restraints, that's number one. So they released his restraints later on that night, and I just kind of sat there and watched him. So -- basically so he wouldn't hurt himself. If I can recall, it was for a suicide watch. I'm going to say that's what I recall.

In a deposition, Ms. Chrisanthon testified that she received a phone call from the Assistant Nurse Manager of the Silverstein 10 Unit, Jessica McCullion, after Plaintiff completed her shift. According to Ms. Chrisanthon's testimony and Ms. McCullion's declaration, Ms. McCullion informed Ms. Chrisanthon that Plaintiff was observed sleeping during a 1:1 observation of the patient during Plaintiff's March 5–6 Overnight Shift and was also observed with headphones in her ears, playing music, and FaceTiming on her phone during the shift. Upon receipt of this report from Ms. McCullion, Ms. Chrisanthon spoke to Plaintiff who denied sleeping during the 1:1 observation on the March 5–6 Overnight Shift.

Ms. McCullion gathered three witness statements from her direct reports on the Silverstein 10 Unit regarding the incident and provided those statements to Ms. Chrisanthon. One of the reports obtained was from Jenna Castelberg, a Registered Nurse on the Silverstein 10 Unit who worked the night shift and personally observed Plaintiff's conduct during the March 5–6 Overnight Shift, wrote the following in her statement:

> As we talked about, these are the events that happened with the 1:1 in 1018 on 3/5 from 2300-0700. RN Walked into the room, 1:1 was sleeping. Alerted charge nurse who entered the room and 1:1 woke up. 1:1 was constantly on her phone with headphones in, talking on the phone, and facetiming. Relieved 1:1 for break. 1:1 was gone for one hour and fifteen minutes.

Elizabeth Caravello, a Registered Nurse on the Silverstein 10 Unit who worked the day shift and personally observed Plaintiff's conduct on the March 5–6 Overnight Shift, wrote the following in her statement:

> I'm writing you about a [sic] scenario I walked into when I came into receive report about a patient on a 1:1 for agitation/post up delirium the day prior. Fortunately, the patient became lucid and alert within an hour of my shift and has since stayed off the 1:1. I entered the room the CNA (Michelle I caught on her name tag) had her cell phone in her phone connected to ear buds playing music (and I could hear it from feet away). She continued to stand there

>with the music playing while myself and the night shift RN: got the 0700 vitals, got the patient up, etc[.] while the CNA stood on her phone. I asked her to get the materials to check the AM blood sugar twice (the first time she couldn't hear me). When I asked the RN if the CNA was helpful at all overnight and she said no, and she caught her sleeping[.] I'm sorry[.]

Catherine "Kate" Burke, the Charge Nurse who was on duty on the Silverstein 10 Unit during the March 5-6 Overnight Shift and who received a report from Ms. Castelberg, wrote the following in her statement:

>As you know, the patient in 1018 was on a 1:1 through the night last night, 3/5/20 7p-7a. The primary RN entered the room at approximately 0200 to relieve said 1:1. She came out of the room and said "the 1:1 is asleep." I entered the room and as I walked around curtain, the 1:1 turned toward me and I asked her if everything was okay? She replied, yes and said she was just waiting for the nurse to relieve her.

According to Ms. Chrisanthon, after reviewing the witnesses' statements, she; Mr. Umile, the Rhoads 6 Unit's Human Resources representative; and Kristen Maloney, Ms. Chrisanthon's direct supervisor, collectively made the decision to terminate Plaintiff's employment. Plaintiff's employment was terminated on March 11, 2020. The decision to terminate Plaintiff's employment was based on a number of factors: (1) Plaintiff was in active discipline, having received a First Written Warning within the last year; (2) Plaintiff had previously been counseled about the consequences of sleeping at work; and (3) during the March 5–6 Overnight Shift, Plaintiff was observed sleeping by Ms. Castelberg (who reported her observation contemporaneously to Ms. Burke) and was observed by Ms. Caravello with headphones in her ears, playing music, and FaceTiming, all in violation of the Progressive Steps Policy. Plaintiff contends that these stated reasons were pretextual for discrimination.

Following the termination of Plaintiff's employment, Ms. Chrisanthon hired Marcia Aycock, who identifies as African American, to fill Plaintiff's position.

Prior to commencing this civil action, on June 26, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, ("EEOC"), and with the Pennsylvania Human Relations Commission ("PHRC"), naming Defendant, as respondent.

**LEGAL STANDARD**

Rule 56 governs the summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this Rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Rule 56(c) provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *See* Fed. R. Civ. P. 56(c)(1)(A)–(B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving

party may not rely on bare assertions, conclusory allegations or suspicions, *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings, *Celotex*, 477 U.S. at 324.  Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

**DISCUSSION**

Plaintiff asserts claims of unlawful termination of her employment under Title VII and the PHRA premised on discrimination based on her race and retaliation for her complaints of harassment.  In its motion for summary judgment, Defendant argues that the claims against it should be dismissed because Plaintiff cannot establish a *prima facie* case of discrimination or retaliation.  Defendant also argues that to the extent Plaintiff intended to assert a claim for hostile work environment, such a claim is time-barred.  Plaintiff's claims and Defendant's arguments will be addressed *seriatim*.

### *General Law Applicable to Title VII and PHRA Claims*

Title VII and the PHRA prohibit employers from discriminating against employees on the basis of the employee's race.  *See* 42 U.S.C. § 2000e-2(a);[6] 43 Pa. Cons. Stat. § 951 *et seq.*;[7] *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000).  At the summary judgment stage, claims brought under Title VII and the PHRA are both analyzed under the burden-

---

[6] Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a).

[7] The PHRA provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . race . . . of any individual . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract."  43 Pa. Cons. Stat. § 955(a).

8

shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 213 n. 2 (3d Cir. 2011). Because the scopes of protection provided under Title VII and the PHRA are not materially different and the standard is the same, this Court's analysis of Plaintiff's Title VII claims applies equally to her PHRA claims.

To maintain an employment discrimination claim under Title VII or the PHRA, a plaintiff must first exhaust her administrative remedies. *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997). "To bring suit under Title VII, a claimant . . . must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice," and to bring suit under the PHRA, the plaintiff must file an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 164–65 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1); 43 Pa. Cons. Stat. § 959(h)). Any claims premised on wrongful conduct occurring outside the prescribed periods must be dismissed. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Mandel*, 706 F.3d at 165; *Emmell v. Phoenixville Hosp. Co.*, 303 F. Supp. 3d 314, 325 (E.D. Pa. 2018) (citing *Morgan*).

Here, Plaintiff dually filed the requisite charges of race discrimination and retaliation with the EEOC and the PHRC on June 26, 2020. Thus, when applying the respective statutes of limitation cited above, only claims for acts of discrimination that occurred on or after August 31, 2019 (300 days prior to June 26, 2020), are actionable under Title VII, and only claims for acts of discrimination which occurred on or after December 28, 2019 (180 days prior to June 26, 2020), are actionable under the PHRA.

*Plaintiff's Hostile Work Environment Claims*

As noted by Defendant, it is not clear from Plaintiff's complaint whether she intended to assert hostile work environment claims.  Defendant argues, *inter alia*, that to the extent Plaintiff intended to assert hostile work environment claims, such claims are time-barred because they are premised on conduct that occurred prior to August 31, 2019, outside the applicable statutes of limitation.  In response, Plaintiff acknowledges that the claims "are not individually actionable" but contends that the alleged conduct can be considered to support her other claims of discrimination.  (*See* Pl.'s Resp., ECF 16-1, at pp. 10–11).

In light of this acknowledgment, Defendant's motion is granted with respect to any claim for hostile work environment.

*Plaintiff's Claims for Race Discrimination*

Plaintiff asserts that Defendant wrongfully terminated her employment on account of her race in violation of Title VII and the PHRA.  Defendant argues that Plaintiff has failed to establish a *prima facie* case of race discrimination under Title VII and the PHRA.  As noted, at the motion for summary judgment stage, claims under Title VII and the PHRA are analyzed under the *McDonnell Douglas* burden-shifting analysis.  *See Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 172 (3d Cir. 2014).

Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of discrimination by producing evidence to show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff is qualified for the job; (3) the plaintiff suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of discrimination or that similarly situated persons who are not members of the plaintiff's protected

class were treated more favorably. *Id.* at 172–73 (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–12 (3d Cir. 1999)).

Plaintiff established a *prima facie* showing of discrimination—by showing that because she is African American, she is a member of a protected class; she is qualified for the position, having been hired in 2016 as a CNA and continued working until her employment was terminated in 2020; she suffered an adverse employment action when she was fired; and this action occurred under circumstances that give rise to an inference of unlawful discrimination.

Once Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to Defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If Defendant satisfies this phase, the burden shifts back to Plaintiff to prove that the legitimate reason(s) offered by Defendant are merely a pretext for discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 804–05 (3d Cir.1994). To show pretext, Plaintiff must provide evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

Here, Defendant argues that Plaintiff's employment was terminated for cause and offers as its legitimate non-discriminatory reason the following: while performing an overtime assignment, Plaintiff was "observed sleeping on duty while in a 1:1 patient assignment on the Silverstein 10 nursing unit on the overnight shift of March 5/6 2020." [*See* ECF 12-3, pg. 115, Termination letter dated March 1, 2020]. The termination letter advised her that "[S]leeping on duty is in violation of I-ITJP Human Resources Policy 2-06-07 "Performance Improvement and Progressive Steps".

There is no dispute that Plaintiff was on the 1:1 observation assignment. Plaintiff acknowledged during a deposition that the patient she was assigned to watch was on suicide watch but denies that she was sleeping or not fulfilling her obligations toward the patient. Defendant further argues that Plaintiff was also observed listening to music during this tour of duty. These violations were immediately documented in two separate reports from different registered nurses who observed Plaintiff's conduct during a 1:1 observation of a suicidal patient on March 5-6, 2020; on report for sleeping while on duty and the other for failing to provide full and complete attention to a vulnerable patient when Plaintiff was reported with earphones in and listening to music and facetiming on her personal cell phone. Defendant argues that both reports, on their own, are termination offenses in the first instance. Based on these reports and the Progressive Steps Policy, Defendant has articulated a "legitimate, nondiscriminatory reason" for the termination or the adverse employment action taken against Plaintiff.

Consistent with the *McDonnell Douglas* analysis, once Defendant articulated its legitimate nondiscriminatory reason for the termination, the burden shifts back to Plaintiff to prove that the legitimate reason(s) offered are merely a pretext for discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 804-05 (3d Cir. 1994). To make a showing of pretext, a plaintiff can provide evidence "from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the employer's action." *McDonnell Douglas* at 764. To meet this burden, the plaintiff must do more than show that Defendant's proffered reasons were wrong or mistaken. *Id*. The plaintiff must "present evidence contradicting the core facts put forth by Defendant, the employer, as the legitimate reasons for its decision," *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005), and "demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765.

To show that discrimination was more likely than not a cause of the employer's action, Plaintiff can point to evidence "that the employer has previously discriminated against [her], that the employer has discriminated against other persons within the Plaintiff's protected class or within another class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). Where a plaintiff presents evidence of similarly situated non-class members to sustain her burden at the pretext stage, she must show with some specificity that the comparators were more favorably treated. *Id*. at 646.

Here, Defendant argues that Plaintiff has failed to present evidence sufficient to overcome its nondiscriminatory reason for the termination. In her response to the motion for summary judgment, Plaintiff argues that as one of the decision-makers in her termination, "Ms. Chrisanthon's prior behavior and prior discriminatory treatment is relevant in evaluating whether discriminatory intent and motive played a primary role in Ms. Chrisanthon's recommendation and decision regarding Plaintiff's termination." Plaintiff further argues that her harassment complaints were ignored, and because she "was on a leave of absence for several months prior to her termination, an inference could be drawn that the discrimination was on pause", and that upon her "return, it can be inferred that Ms. Chrisanthon looked for the slightest hint of a reason to provide a pretextual basis to terminate Plaintiff." In support, Plaintiff relies on *Jalil v. Avdel Corp.*, 873 F.2d 701, 708-09 (3d Cir. 1989) (finding that the timing of a termination in connection with other information could suggest the possibility that the employer seized upon the instance of insubordination to fire to disguise a discriminatory or retaliatory motive). Plaintiff's reliance on

*Jalil* is, however, misplaced. As discussed in the retaliation analysis, the gap between the harassment Plaintiff allegedly endured and the termination of her employment is over 18 months. The extended passage of time negates a continuous pattern of unlawful action to support her claim of retaliation and her argument that Ms. . Chrisanthon was waiting for the opportune time or comment to terminate Plaintiff's employment. Except for her own statement, Plaintiff point to no other evidence to support her assertion. This argument also ignores the fact that the two independent register nurses who reported Plaintiff sleeping on duty and listening to music during the 1:1 observation assignment of a suicidal patient, were from a different unit located in a different building with no apparent axe to grind. Plaintiff has not shown that any animus of these two nurses, or any prior discriminatory conduct Ms. Chrisanthon may have had that played any part of those nurses' reports. Notably, Plaintiff admitted at her deposition that the registered nurses who reported her behavior to Ms. Chrisanthon had no knowledge of her or her disciplinary history and, therefore, had not reason to lie. Once Ms. Chrisanthon received the reports she commenced the disciplinary process that resulted in Plaintiff's termination. Undeniably, sleeping while on a 1:1 observation duty is a serious disciplinary misconduct and pursuant to the Progressive Steps Policy is subject to termination. Except for Plaintiff's bald assertions, Plaintiff offers no evidence "from which a fact-finder could reasonably disbelieve the employer's articulated legitimate reasons". She further offers no reason why the reports from registered nurses in another unit should be disbelieved.

Defendant further argues that Plaintiff cannot demonstrate that the reasons given for her employment termination were pretextual or under circumstances giving rise to an inference of unlawful discrimination. To establish pretext, a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected

class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Drummer v. Hospital of Univ. of Penn.*, 455 F. Supp. 3d 160, 168 (E.D. Pa. 2020) (citing *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) and *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). Further, "[a]n inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action." *Howard v. Blalock Elec. Serv., Inc.,* 742 F. Supp. 2d 681, 702 (W.D. Pa. 2010). When relying on comparator evidence, a plaintiff must show that the individuals engaged in the same conduct as plaintiff and that they shared all relevant aspects of her employment. *See Gazarov ex rel Gazarov v. Diocese of Erie,* 80 F. App'x 202, 306 (3d Cir. 2003) (noting that individuals are similarly situated only where they engaged in the "same conduct"); *see also Wilcher v. Postmaster General*, 441 F. App'x 879, 88 (3d Cir. 2011) ("A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in."). To be deemed similarly situated the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it

Here, in response to the motion for summary judgment Plaintiff offers little evidence or argument. Plaintiff identified Eva Zois as a Caucasian CNA comparator who Plaintiff argues was caught sleeping during working hours and not fired. It is undisputed, however, that the only report received by Ms. Chrisanthon regarding Ms. Zois' sleeping at work related to an incident which occurred on August 19, 2020, *after* Plaintiff's employment ended. Further, Ms. Zois was caught

nodding off during a staff meeting and was counseled.  Based on these facts, this Court finds that Ms. Zois and Plaintiff are not similarly situated comparators.  Plaintiff was observed sleeping during a 1:1 observation of a patient on suicide watch, while Ms. Zois was observed nodding off during a staff meeting ─ a non-patient setting.  The difference in their conduct, the settings and the possible consequences of their conduct are critical factors.  No patient's life was at risk in Ms. Zois' case.  Defendant also argues that Ms. Dennis, an African-American CNA on Rhoads 6 unit, arguably another comparator, was reportedly "resting her eyes" during patient observation.  The reporter was not clear if Ms. Dennis was truly sleeping.  Because of that uncertainty, Ms. Dennis' employment was not terminated following this incident, though she was disciplined.  However, no discriminatory or retaliatory animus can be inferred from the fact that Ms. Dennis was treated more favorably than Plaintiff given that both she and Plaintiff are African Americans.

In light of this analysis, this Court finds that Plaintiff has failed to establish comparator evidence under the fourth prong of the *McDonnell Douglas* analysis of her discrimination claims to establish an inference of unlawful discrimination.  Plaintiff also cannot cite any evidence that "otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Drummer*, 455 F. Supp. 3d at 168.  Rather, Plaintiff relies solely on her own subjective assertions of discrimination which are insufficient to establish a case of racial discrimination.  *Howard,* 742 F. Supp. 2d at 702.  Therefore, Defendant's motion for summary judgment is granted.

### *Plaintiff's Retaliation Claims*

Plaintiff also asserts claims for retaliation under Title VII and the PHRA premised on her contention that her employment was terminated in retaliation for her complaints in September 2018 about treatment she received from co-workers.  Defendant moves for summary judgment on

the grounds that, *inter alia*, Plaintiff has failed to produce evidence sufficient to meet the first and third elements of a *prima facie* retaliation claim.

Retaliation claims asserted under both Title VII and the PHRA are also subject to the *McDonnell Douglas* burden-shifting analysis. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).[8] Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected activity; (2) Defendant took a materially adverse employment action against her after or contemporaneous with her protected activity; and (3) there is a causal connection between her participation in the protected activity and Defendant's adverse action. *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 320 (3d Cir. 2008). A causal connection between the protected activity and adverse action may be inferred from: (1) an unusually suggestive temporal proximity between the two; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole. *Kachmar v. SunGuard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).[9]

Defendant argues that Plaintiff has failed to meet her *prima facie* burden of showing that she engaged in the requisite protected activity. Specifically, Defendant argues that Plaintiff has failed to proffer any evidence to show that any of her complaints were related to prohibited

---

[8] Retaliation claims under Title VII and the PHRA have the same legal requirements. *See Slagle v. Cnty. of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006).

[9] If Plaintiff establishes a *prima facie* case, the burden shifts to Defendant to advance a legitimate, non-retaliatory reason for its action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997). If Defendant meets this burden, the burden shifts back to Plaintiff to show pretext by providing evidence by which a factfinder could reasonably (1) disbelieve Defendant's proffered legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action. *Fuentes*, 32 F.3d at 764. Again, this requires Plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765. Because this Court finds that Plaintiff has not met her burden with respect to the *prima facie* elements of her retaliation claims, it will not address Defendant's additional pretext arguments.

employment practices under Title VII. To fall within Title VII's protection, the protected activity must relate to an illegal, discriminatory employment practice under Title VII. *Curay-Cramer v. Ursuline Acad. of Wilmington, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). Title VII prohibits employment discrimination based on race, color, sex, religion, or national origin. 42 U.S.C. § 2000e-2. "A general complaint of unfair treatment does not translate into a charge of illegal [] discrimination." *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 485 (E.D. Pa. 2013) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). To qualify as protected activity, the employee's complaint must identify the employer's unlawful practice by either explicitly or implicitly identifying the protected characteristic. *Barber*, 68 F.3d at 702.

Plaintiff's entire response to Defendant's challenge to the first and third elements is as follows:

> Plaintiff was treated differently by two of Defendant's employees, to include the situation involving "Ricky." Plaintiff complained of harassment and Ms. Chrisanthon held a meeting with the harasser and Plaintiff both present. When the harassment continued, she failed to take additional action. Ms. Chrisanthon's differentiating treatment, as discussed above and in the Response to the Statement of Undisputed Material Fact, led to Plaintiff elevating her complaints to a higher level. As Plaintiff testified, Ms. Chrisanthon did not like that Plaintiff raised concerns with human resources. Defendant made a big deal about the large span of time between the harassment Plaintiff experienced and her termination, but largely overlooks the period of time Plaintiff was on a leave of absence in that an inference could be drawn that the antagonism only was on hold while Plaintiff was away. A factfinder could infer that Ms. Chrisanthon was awaiting an opportunity to force Plaintiff out given Plaintiff's action of elevating her complaint and find said elevation protected activity. As such, sufficient evidence exists to demonstrate a dispute of material fact on Plaintiff's retaliation claims. Summary Judgment should be denied.

(Pl.'s Resp., ECF 16-1, at p. 9). Notably, Plaintiff's response contains no citations to any record evidence whatsoever. As such, it constitutes Plaintiff's mere allegations and subjective beliefs,

which, at the summary judgment stage, are insufficient to carry Plaintiff's burden. *DuFresne*, 676 F.2d at 969. Moreover, nowhere does Plaintiff contend that any of her complaints were connected to any illegal, discriminatory employment practice under Title VII.[10] For these reasons alone, Defendant's motion for summary judgment is granted with respect to Plaintiff's retaliation claims.

Plaintiff's response also fails to cite to any record evidence from which a reasonable factfinder could infer a causal connection between her participation in the alleged protected activity and Defendant's adverse action. Plaintiff's purported complaints about her treatment by other employees occurred in September 2018. Her employment was terminated on March 11, 2020, eighteen months after Plaintiff's alleged protected activity. This eighteen-month gap between the alleged protected activity and the adverse action is not "unusually suggestive" or otherwise sufficient "to create an inference of causality." *See LeBoon v. Lancaster J.C.C. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (finding a five-month gap between protected activity and adverse action insufficient by itself to support inference of causation). In the absence of any evidence connecting her employment termination to her

---

[10] Paragraph 48 of Defendant's Statement of Undisputed Material Facts provides as follows: "Notably, nowhere in her reports to Ms. Chrisanthon or Ms. Corso does Plaintiff indicate that she believes she was being bullied or harassed due to her race." (ECF 12-2, ¶ 48). Without citation to any other evidence, Plaintiff responded as follows: "Disputed as argumentative and asking inferences to be drawn. It is further stated that even if Plaintiff did not mention race, it is disputed that said harassment was not based on race." (ECF 16-2, ¶ 48). At the summary judgment stage, Plaintiff bears the burden of producing evidence sufficient to meet each *prima facie* element of her retaliation claim, including evidence showing that her complaints were connected to illegal, discriminatory conduct precluded by Title VII. Simply claiming a fact is "disputed" without producing supporting record evidence falls short of meeting this burden.

complaints, Plaintiff has not met her summary judgment burden. Accordingly, Defendant's motion for summary judgment is granted with respect to Plaintiff's retaliation claims.

**CONCLUSION**

For the reasons set forth, this Court finds that Plaintiff has failed to meet her summary judgment burden with respect to both her discrimination and retaliation claims. Specifically, Plaintiff has failed to provide evidence sufficient to meet the *prima facie* elements of her claims. As such, Defendant's motion for summary judgment is granted, and Plaintiff's claims are dismissed. An Order consistent with this Memorandum Opinion separately follows.

*NITZA I. QUIÑONES ALEJANDRO, J.*